PLAINTIFF'S EXHIBIT 3

ALL-STATE LEGAL®

**HOST COMMUNITY AGREEMENT**

by and between

**PIKE COUNTY FISCAL COURT, KENTUCKY**

and

~~[NEWCO]~~
AMERICAN LAND RESERVE LLC

**DATE:** February 10, 2026

## HOST COMMUNITY AGREEMENT

This Host Community Agreement ("**Agreement**") is made and entered into this 10th day of February, 2026, by and between the Pike County Fiscal Court, with an address of 146 Main St, Pikeville KY 41501 (the "**County**") and ~~[NEWCO]~~, [a Kentucky limited liability company ~~yet to be formed~~], with an address at 555 Taylor Road, Enfield, CT 06082 American Land Reserve LLC ("**Operator**") (each of the County and Operator to be referred to as a "**Party**" and collectively, as the "**Parties**").

## RECITALS

**WHEREAS**, from October 14 - 16, 2025, the County advertised in the Appalachian News-Express a "Request for Proposal for Host Community Agreement" ("**RFP**") seeking a private operator to invest in the County, construct a large-scale landfill and agree to accept all the County's solid waste for at least twenty (20) years;

**WHEREAS**, on October 21, 2025, Operator's affiliate, USA Waste and Recycling, Inc. ("**USA**") timely responded to the RFP;

**WHEREAS**, at a public meeting on October 21, 2025, the County accepted USA's proposal and authorized the County to enter into contract negotiations with USA;

**WHEREAS**, on November 7, 2025, the County issued an award letter to USA;

**WHEREAS**, in accordance with its response to the RFP, Operator intends to develop, construct, own and operate a solid waste disposal landfill facility ("**Facility**") in Pike County, Kentucky;

**WHEREAS**, Operator owns, intends to own, or has options to purchase or control land on Highway 610 West, Myra, Kentucky consisting of approximately 1500 +/- acres containing abandoned and/or reclaimed mine lands;

**WHEREAS**, Operator intends to request approvals to construct and operate the Facility from the Kentucky Energy and Environment Cabinet (the "**Cabinet**");

**WHEREAS**, it is Operator's intent that such Facility will be authorized by the Cabinet to receive, accept, and dispose Solid Waste (as defined herein) pursuant to a permit granted therefrom; and

**WHEREAS**, the County and Operator enter into this Agreement for the following purposes:

1. To secure for the County sufficient local capacity for Solid Waste generated within and controlled by the County during the term of this Agreement;

2. To define the geographic area from which the Facility may receive and accept for disposal Solid Waste;

 GA

3. To establish consideration to be provided to the County by Operator in connection with the operation of the Facility and the basis upon which said consideration shall be provided;

4. To assure that Solid Waste transported to the Facility is responsibly received, managed, and disposed;

5. To assure that the receipt and disposal of Solid Waste in the Facility is managed appropriately;

6. To minimize the risk of contamination by the Facility of the air, land, and water resources of the County;

7. To assure the provision of funding assurances for the monitoring and remediation, if necessary, of environmental issues that occur during the active life of the Facility, and during the Facility's closure and post-closure care periods; and

8. For all other lawful purposes addressed herein.

**NOW THEREFORE**, for mutual consideration, the adequacy and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## ARTICLE I. DEFINITIONS

**Section 1.01** Each of the following terms used in this Agreement, unless otherwise expressly defined, shall have the meaning set forth below:

**(a)** "**Action**" has the meaning ascribed to it in Section 10.02(c).

**(b)** "**Agreement**" shall mean this Host Community Agreement, any amendments subsequently agreed to by both Parties, and any schedules attached hereto;

**(c)** "**Applicable Law**" shall mean all federal, state, and local statutes, laws (including common law), rules, regulations, orders, ordinances or codes, and judicial and administrative orders and interpretations thereof applicable to the existence, modification, permitting and operation of the Facility;

**(d)** "**Authorizations**" shall mean any permit, approval, authorization, license, variance, order, ruling, decree or permission from any federal, state, county, or municipal court, agency, board, legislature, commission, or other legislative, judicial, administrative, or regulatory body or any entity or person necessary for the development, construction and operation of the Facility, including the Permit;

**(e)** "**Cabinet**" shall mean the Kentucky Energy and Environment Cabinet, an agency of the Commonwealth of Kentucky;

**(f)** "**Change-in-Law**" shall mean the adoption, subsequent to the Effective Date, of any state, federal or local constitution, constitutional provision, law, regulation, rule,

ordinance, standard or permit condition applicable to the Facility or its operation or to any operation or program contemplated by this Agreement, or any change, amendment, expansion, or change of interpretation or application of the same, which are beyond the control of Operator and not the result of the willful action of Operator, which significantly, substantially or materially affects the practicality, feasibility, or costs to perform its obligations hereunder, including the design, engineering, or commercial operation of the Facility;

(g) "**City**" shall mean the City of Pikeville, Kentucky;

(h) "**City Waste**" shall have the meaning ascribed to it in Section 4.02)(b).

(i) "**Commercial Hauler**" shall mean a Person that collects, transports, and/or disposes Solid Waste for a fee;

(j) "**Commencement Date**" shall mean the first date on which the Facility accepts Solid Waste for disposal in the ordinary course of commercial operations pursuant to all Required Approvals.

(k) "**Conditions Precedent**" shall mean those certain conditions described in Section 3.02, the satisfaction or waiver of such are required before this Agreement shall become effective and enforceable, provided that the obligations of the Parties contained in Section 3.02 and other obligations of the Parties contained herein that, by their plain language, are operative prior to the Commencement Date, are effective and binding as of the Effective Date;

(l) "**C&D Waste**" shall mean construction/demolition waste as defined in 401 KAR 47.005(36), as amended and includes construction materials as defined in 401 KAR 47.005(37);

(m) "**County**" shall mean Pike County, Kentucky and any political subdivisions thereof.

(n) "**County Waste**" shall have the meaning ascribed to it in Section 4.01(a); and if a sub-agreement between the County and City exists as contemplated in Section 4.02(b), shall include City Waste.

(o) "**Effective Date**" shall mean the date the Agreement is signed by the last Party;

(p) "**Facility**" shall mean the contained landfill, all areas permitted by the Cabinet or other regulatory authority for the disposal of Solid Waste, receiving and unloading buildings, outbuildings, rail infrastructure, and other appurtenant buildings and structures that are described and identified in the Permit contemplated to be issued by the Cabinet and other local authorities to Operator;

(q) "**Fiscal Court**" shall mean the Pike County Fiscal Court / Commission;

(r) "**Engineer's Design and Cost Report**" shall mean an engineering report prepared by Operator's third party engineer, in a form submittable to the Cabinet as part of or as

providing the foundation of an application for a Permit to the Cabinet, describing the footprint and layout of the Facility, design of cell constructions and layouts, mine subsidence information, and cost evaluation for the development, construction, and continued operation of the Facility..

(s) "**Force Majeure Event**" shall mean an act, event or condition relied upon by a Party as justification for delay in or excuse from performing or complying with any obligation duty or agreement required of such Party under this Agreement which act, event, or condition is beyond the control of the Party claiming such Force Majeure including, without limitation, an act of God, landslide, lightning, earthquake, fire, explosion, storm, flood, or similar occurrence; pandemic; interference by third parties with any operations or duties of the Parties; termination, cessation, pause, or interruption of rail service to the Facility for any reason; war, riot, blockade, or restraint of government and people; civil disturbance or disobedience; sabotage or similar occurrence; strike, work slowdown or similar labor action; a Change-in-Law having an effect on the operations or profitability of the Facility; the order or judgment or other act of any federal, state, county or other court, administrative agency, or governmental office or body; the denial, loss, suspension, termination, or failure to renew any permit, license or other governmental approval which does not result from any act or omission of the Party asserting Force Majeure; and the institution of a legal or administrative action or similar proceeding by any individual, agency, or other entity which delays or prevents operation of the Facility which does not result from any negligent or willful act or omission of Operator;

(t) "**Governing Body**" shall mean the County, or such other entity that is established as the governing body pursuant to KRS Chapter 224 and KRS Chapter 109, and applicable regulations;

(u) "**Hazardous Waste**" shall mean hazardous waste as defined in KRS 224.01-010(30)(b), as amended;

(v) "**In-County Waste**" shall mean Solid Waste generated within the boundaries of Pike County;

(w) "**Indemnified Party**" has the meaning ascribed to it in Section 10.02(c).

(x) "**Indemnifying Party**" has the meaning ascribed to it in Section 10.02(c).

(y) "**Initial Term**" shall have the meaning ascribed in Section 3.01.

(z) "**KAR**" shall mean the Kentucky Administrative Regulations;

(aa) "**KRS**" shall mean the Kentucky Revised Statutes;

(bb) "**Life of Site**" shall mean such time as the Facility can no longer accept Solid Waste by virtue of having reached its permitted capacity;

(cc) "**Losses**" shall have the meaning ascribed in Section 10.02(a).

(dd)"**Mine Subsidence Remediation**" shall mean all drilling, filling, removing, collapsing, and all other engineering or construction work related to the underground and above ground mines at the Facility site desired, necessary, or required to allow the Facility site to be suitable for a Subtitle D landfill as intended by the Operator.

(ee) "**Municipal Solid Waste**" shall mean municipal solid waste as defined in KRS 224.01-010(30)(a)(4), as amended;

(ff) "**NORM**" shall mean naturally occurring radioactive material as defined in KRS 211.862(8), as amended.

(gg) "**Nuclear Waste**" shall mean source, special nuclear, or by-product material as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 923);

(hh)"**Operating Hours**" shall mean the routine reasonable operating hours of the Facility, and unless otherwise agreed to in writing by the Parties, shall be twenty-four (24) hours each day; provided that receiving hours of Solid Waste by truck and/or rail may vary and are at the reasonable discretion of Operator;

(ii) "**Out-of-County Waste**" shall mean Solid Waste generated outside the boundaries of Pike County;

(jj) "**Permit**" shall mean that certain permit or permits or other authorization(s) issued by the Cabinet to Operator which authorizes the development, construction, and operation of the Facility, the site(s) and boundaries of which shall be defined therein;

(kk)"**Person**" shall mean person as defined in KRS 224.01-010(16);

(ll) "**Plan Amendment**" shall mean an amendment to the Plan made by the County or the Governing Body having authority over the Plan that incorporates the Plan Amendment Provisions and is approved by the Cabinet;

(mm) "**Plan Amendment Provisions**" shall mean provisions in an amendment to the Plan made by the County or the Governing Body having authority over the Plan that (i) allow for the development, construction and operation of the Facility as permitted by the Commonwealth of Kentucky and the Cabinet comprising of one or more related sites operating within the County limits on a large surface and underground mine site track(s), where there is a reasonably limited population of people and home sites in proximity; (ii) allow for the acceptance and disposal of Solid Waste generated both within the County and outside the County; (iii) allow for the delivery to the Facility of Solid Waste via rail and railcars, as permitted by railroad operators, long haul tractor trailers, waste route trucks, and any other commonly used vehicles for Solid Waste disposal; and (iv) allow further amendments to the Plan in the future to accommodate the Facility's needs for continued operation, expansion, or other modifications required by Operator's needs;

(nn)"**Prohibited Materials**" shall mean those materials described in Section 7.02;

(oo) "**Rail Service Commitment**" has the meaning ascribed in Section 3.02(c)(i).

(pp) "**Records**" shall mean any and all paper or electronic documents, correspondence, permit requests, permits, licenses, statements, personnel forms, or anything reasonably required by KRS Chapter 224 or 401 KAR Chapters 47 or 48 to be filed with the Cabinet;

(qq) "**Required Approval(s)**" shall mean all (a) final, unappealable Authorizations, including the Permit, necessary for the development, construction and operation of the Facility; or (b) if an appeal was filed, such appeal (including litigation and any appellate litigation) has been finalized in a manner that does not deny the Permit or any such Authorization necessary for the development, construction and operation of the Facility or impose new or additional conditions or provisions thereon. Required Approvals shall include, without limitation: (1) a final, non-appealable Permit, or a Permit for which all appeals periods have expired without challenge, authorizing the construction, operation, and long-term maintenance of the Facility; (2) any zoning, land-use, or site approvals required by the County or other authority; (3) all stormwater, erosion-control, and surface-water approvals required; (4) all roadway, entrance, and traffic-control approvals; (5) all air, groundwater, or other environmental approvals required prior to construction or operation; and (6) any additional Authorizations or compliance determinations that, by law, regulation, or permitting practice, are a precondition to landfill development, construction or operation. In all events, the Required Approvals must allow the Facility to accept and dispose of Solid Waste throughout the Term.

(rr) "**Solid Waste**" shall mean solid waste as defined in KRS 224.01-010(30)(a) and C&D Waste to the extent not covered by KRS 224.01-010(30)(a);

(ss) "**Solid Waste Coordinator**" shall mean the Pike County Solid Waste Coordinator;

(tt) "**Solid Waste Management Plan**" or "**Plan**" shall mean the solid waste management plan developed by the Governing Body pursuant to KRS 224.43-345 and any other applicable law, and approved by the Cabinet;

(uu) "**Specific Damages**" has the meaning ascribed to it in Section 6.04.

(vv) "**Term**" shall mean the term of this Agreement, including any renewal or extension terms, as set forth in Section 3.01;

(ww) "**Undue Burden(s)**" shall mean any operational, tonnage, service-area, waste-type, or design limitation that (1) materially deviates from the performance or design standards set forth in 401 KAR 47 and 48; (2) imposes daily or annual tonnage limits below the levels required for the commercially reasonable and economically feasible operation of the Facility; (3) restricts the Facility's service area or waste acceptance in a manner not generally applicable to similarly situated Subtitle D facilities in the Commonwealth or surrounding region; or (4) imposes operational mandates that would reasonably be expected to increase annual operating costs by more than five percent (5%) above Operator's pro forma projections; and

(xx) "**Unrelated Medical Waste**" shall mean medical waste that has not been rendered noninfectious in accordance with prevailing public health standards and practices in Kentucky, as updated and amended.

## ARTICLE II. REPRESENTATIONS

### Section 2.01 Representations of Operator

(a) **Duly Organized.** Operator is a Kentucky limited liability company duly organized and in good standing;

(b) **Full Power and Authority.** Operator has the full power, authority and legal right to enter into and perform this Agreement and the execution, delivery and performance hereof have all required approvals and will not violate any judgment, order, law, or regulation applicable to Operator;

(c) **Duly Authorized.** This Agreement has been duly authorized, voluntarily executed, and delivered by Operator, was not executed by Operator under duress, and constitutes a legal, valid, binding obligation of Operator, enforceable in accordance with its provisions;

(d) **Persons Authorized.** Operator represents that the Persons who sign herein below have full authority to sign on behalf of Operator and to bind such entities by authority of their respective management; and

(e) **No Action or Suit.** There is no action, suit, or proceeding at law or in equity before or by any court or governmental authority pending or threatened against Operator in which an unfavorable decision, ruling, or finding would materially adversely affect the performance by Operator of its obligations hereunder or other transactions contemplated hereby or that in any way materially adversely affect the validity and enforceability of this Agreement.

### Section 2.02 Representations of County

(a) **Duly Organized.** The County is a political subdivision duly organized, existing and in good standing under the laws of the Commonwealth of Kentucky. The Fiscal Court is the legislative body of the County, and along with the Governing Body, has primary responsibility for solid waste management in the County;

(b) **Full Power and Authority.** The County and Fiscal Court have full power, authority and legal right to enter into and perform this Agreement and the execution, delivery and performance hereof have all required approvals and will not violate any judgment, order, law or regulation applicable to the County;

(c) **Duly Authorized.** This Agreement has been duly authorized, executed and delivered by the County and the Fiscal Court, was not executed by the County and the Fiscal Court under duress and constitutes a legal, valid binding obligation of the County and the Fiscal Court, enforceable with its provisions; and

(d) **No Action or Suit.** There is no action, suit, or proceeding at law or in equity before or by any court or governmental authority pending or threatened against the County in which an unfavorable decision, ruling, or finding would materially adversely affect the

performance by the County of its obligations hereunder or other transactions contemplated hereby or that in any way materially adversely affect the validity and enforceability of this Agreement.

**Section 2.03 Survival of Representations.** The representations and warranties of the Parties contained in this Agreement shall survive the date hereof and shall expire upon termination of the Agreement. Neither the County nor Operator shall have any liability whatsoever with respect to any such representations or warranties after the survival period for such representation or warranty expires.

## ARTICLE III. TERM AND COMMENCEMENT DATE

**Section 3.01 Term.** The Term of this Agreement shall be a period of twenty (20) years from the Commencement Date or until the Facility reaches Life of Site, whichever time period is shorter ("**Initial Term**"), unless the Agreement is otherwise terminated pursuant to the terms herein. Subject to Section 3.02 and Section 11.05 herein below, this Agreement shall automatically renew for a period of an additional twenty (20) years after the expiration of the Initial Term (each such term, a "**Renewal Term**," and the Initial Term and any Renewal Terms, collectively, the "**Term**"). For clarity, if the Facility reaches Life of Site within twenty (20) years from the Commencement Date of this Agreement, then Operator agrees to diligently work with the County in good faith to develop a mutually satisfactory plan to manage the disposal of County Waste (as defined below); however, no other obligations, owed by Operator as set forth in this Agreement, shall apply once the Facility has reached its Life of Site.

**Section 3.02 Conditions Precedent to Commencement.** For all purposes other than this Section, the obligations of the Parties effective as of the Commencement Date under this Agreement are expressly conditioned upon the satisfaction, waiver, or written acknowledgment of the following Conditions Precedent [Section 3.02(a)-(e)]. Until all Conditions Precedent have been fully satisfied or waived in writing by the Party entitled to the benefit thereof, neither Party shall have any duty to perform under this Agreement other than the duties expressly set forth in this Section.

**(a) Engineer's Design and Cost Report.**

**(i) Delivery of Report.** Operator shall, at its sole cost and expense, such cost and expense expected to be over $2,500,000.00, procure and deliver to the County by December 31, 2027 (unless otherwise agreed), a final Engineer's Design and Cost Report prepared by a qualified geotechnical and structural engineering firm selected by Operator (the "**Engineer's Design and Cost Report**") addressing and describing the footprint and layout of the Facility, design of cell constructions and layouts, mine subsidence conditions and information within the proposed Facility footprint, and costs associated with the development, construction, and operation of the Facility, including costs associated with mine subsidence remediation. The Parties acknowledge that the Facility site contains historic underground mines which may require substantial remediation or filling in order to develop, construct and operate the Facility.

**(ii) Required Findings.** The Engineer's Design and Cost Report shall (A) confirm that the total capacity volume of the proposed Facility is at least twenty five million one hundred twenty thousand (25,120,000) tons; (B) confirm that per acre cell construction is no more than one million dollars ($1,000,000) per acre; and (C) (1) confirm that mine subsidence remediation at the Facility's proposed location is technically and commercially feasible using generally acceptable engineering practices and methods consistent with 401 KAR 48; and (2) demonstrate that the total estimated cost of all subsidence-related remediation work is less than thirty-five million dollars ($35,000,000.00).

**(iii) Failure of Condition.** If the Engineer's Design and Cost Report does not satisfy all the requirements of this Section, or if any of the findings are inconsistent with the those required findings contained in Section 3.02(a)(ii) (A) – (C), Operator may terminate this Agreement upon written notice, without penalty or further obligation.

**(b) Issuance of All Required Approvals.**

**(i) Required Approvals.** Operator shall have obtained all Required Approvals authorizing the development, construction, and operation of the Facility under Applicable Law, including KRS Chapter 224 and 401 KAR Chapters 30-48 and such Required Approvals must not impose any Undue Burden.

**(ii) Notice of Receipt of Required Approvals.** Upon obtaining Required Approvals, Operator shall deliver a written notice to the County certifying that such Required Approvals have been secured, are final, remain valid, satisfy the requirements of this Agreement, and do not impose any Undue Burden.

**(iii) Failure of Condition.** If (A) any Required Approval is denied, or an appeal of such denial is rejected, or (B) if any Required Approval contains an Undue Burden in Operator's sole discretion, and, in either case, the Parties are unable to mutually resolve such issue within ninety (90) days, Operator may terminate this Agreement upon written notice, without penalty or further obligation.

**(iv) Outside Date.** The Parties shall mutually establish an "Outside Date" (which shall be no sooner than six (6) years from the Effective Date) by which all Required Approvals must be obtained. If all Required Approvals are not secured by the Outside Date, either Party may terminate this Agreement by written notice, without penalty or further obligation.

**(v) Mutual Cooperation.** The Parties shall cooperate in good faith and use commercially reasonable efforts to obtain the Required Approvals. The County shall take all steps to assist Operator in securing Required Approvals for the development, construction and operation of the Facility; provided, however, that nothing in this Agreement shall obligate the County to waive any regulatory requirement.

**(c) Rail Service Commitment.**

(i) **Required Rail Commitment.** Operator shall obtain a written commitment (the "**Rail Service Commitment**") from a Class I railroad, or from another rail carrier reasonably acceptable to Operator, confirming that the carrier will provide continuous, uninterrupted rail service to the Facility as of the Commencement Date and throughout the Term, including: (A) service no fewer than five (5) days per week; (B) service levels and scheduling consistent with customary industry practices for comparable facilities; and (C) commercially reasonable rail rates, terms, and conditions based on prevailing market standards for similar waste-by-rail, bulk commodity, or intermodal movements.

(ii) **Evidence of Commitment**. Upon securing the Rail Service Commitment, Operator shall deliver written notice to the County certifying that a binding commitment has been executed, remains valid, and satisfies the requirements of this Agreement.

(iii) **Failure of Condition**. If (A) Operator is unable to secure a Rail Service Commitment that meets the requirements of this Section; or (B) any proposed commitment contains terms that, in Operator's sole discretion, are commercially unreasonable or inconsistent with customer industry practices, and the Parties are unable to resolve such issue within ninety (90) days after written notice from Operator, then Operator may terminate this Agreement upon written notice, without penalty or further obligation.

(iv) **Mutual Cooperation**. The Parties shall cooperate in good faith and use commercially reasonable efforts to facilitate Operator's negotiations with rail carriers. The County shall take all steps within its authority to support Operator's efforts to secure the Rail Service Commitment; provided, however, that nothing in this Agreement shall obligate the County to waive or disregard any applicable regulatory or statutory requirement.

(d) **Plan Amendment.**

(i) **Plan Amendment.** The County, by April 1, 2026, shall take all necessary steps to amend and maintain the Plan so that the Plan and this Agreement shall be consistent with one another during the Term, including adopting and securing Cabinet approval of the Plan Amendment. Such Plan Amendment, including all such Plan Amendment Provisions, shall continue unchanged in effect and in force until the Commencement Date and through the Term.

(ii) **Notice of Condition Satisfaction.** Upon approving the Plan Amendment, and again upon receipt of Cabinet approval of such Plan Amendment, the County shall deliver a written notice to Operator, certifying that such Plan Amendment has been adopted, approved, and is in effect, whatever the case may be (the date on which the Cabinet approval notice sent, the "**Notice Date**").

(iii) **Failure of Condition.** Failure by the County to adopt and maintain the Plan in accordance with the Plan Amendment and all Plan Amendment Provisions shall constitute material breach of this Agreement and a failed condition precedent. Unless such breach is cured within sixty (60) days after written notice from Operator, Operator may suspend performance or terminate this Agreement without penalty or further obligation, and such termination shall be deemed for cause.

(e) **No Change-in-Law.** With the exception of the Plan Amendment referenced in Section 3.02(d), there shall be no Change-in-Law affecting Operator's intended development, construction or operation of the Facility prior to the Commencement Date nor subsequent to the Commencement Date.

## ARTICLE IV. OPERATOR OBLIGATIONS

### Section 4.01 Capacity Assurance

(a) **Guaranteed Capacity for County Waste.** Beginning on the Commencement Date, Operator shall reserve at the Facility disposal capacity for all Municipal Solid Waste and C&D Waste generated within, controlled by, and the disposal of which is the responsibility of the County during the Term (“**County Waste**”), which shall constitute compliance with the provisions of KRS 224.43-345(1)(l) and (m). This capacity assurance is contingent upon the Facility submitting in accordance with KRS 224.40-315(1) and receiving all Required Approvals without Undue Burdens to develop, construct and operate the Facility to accept and dispose of such County Waste. Extending this capacity to a length of term beyond the Initial Term is contingent upon the Facility submitting in accordance with KRS 224.40-315(1) and receiving all Required Approvals without Undue Burdens to develop, construct, and operate one or more landfill expansions or new landfills on the Facility site.

(b) **Failure to Guarantee Capacity.** If, during the Initial Term of this Agreement, Operator is unwilling, and not as a result of a Force Majeure Event, to receive and dispose in the Facility all County Waste that is delivered to the Facility, Operator shall provide for the receipt and disposal of such County Waste at another permitted disposal facility. The cost for disposal of such County Waste at another facility, including any costs for additional transportation to or disposal at another facility, shall be paid by Operator, to the extent such costs exceed the costs, including transportation, fuel and labor, for disposal of County Waste delivered to the Facility for disposal. Such alternate disposal arrangements shall be the County's sole remedy in the event of failure reserve capacity.

### Section 4.02 Free Disposal / Consideration to the County

(a) **Zero Dollar Tip Fee.** Beginning on the Commencement Date, and for the duration of the Term, Operator shall receive and accept for disposal all County Waste delivered to the Facility by the County or their agents delivering on their behalf, up to a maximum of sixty five thousand (65,000) tons per year, in accordance with the provisions below, at no cost to the County. The Parties acknowledge and agree that as of the Effective Date (i) acceptance and disposal of such County Waste is valued at least eighty dollars ($80.00) per ton; (ii) the County generates approximately fifty two thousand (52,000) tons of County Waste annually; (iii) the value and benefit to the County of accepting and disposing such County Waste at no cost to the County is approximately four million one hundred sixty thousand dollars ($4,160,000.00) annually in 2026 dollars; and (iv) with the anticipated increase in “tipping” and disposal fees nationally and locally, this value will increase with time.

(b) **City Agreement with County.** Subject to the annual tonnage cap described in Section 4.02(a) above, the City of Pikeville (the "**City**"), through separate sub-agreement with the County, may be allowed to deliver the Municipal Solid Waste and C&D Waste generated within, controlled by, and the disposal of which is the responsibility of the City ("**City Waste**") to the Facility for acceptance and disposal at no cost in consideration of the City agreeing to process, at no cost to the County, the leachate from the existing Pike County municipal solid waste landfill located at Ford Mountain. Should the City discontinue such processing, its "no cost" disposal arrangement at the Facility through this Agreement shall cease and Operator shall be permitted to charge the City a "tipping fee" for acceptance and disposal of the City's Municipal Solid Waste and C&D Waste. The County shall provide to Operator any such draft sub-agreement and such sub-agreement shall contain provisions substantially similar to those contained herein governing the City's delivery of City Waste to the Facility, including, without limitation, operational and procedural requirements for deliveries, indemnification obligations in favor of Operator, and insurance requirements of City. The County shall provide to Operator notice in the event that the City ceases to process the County's Ford Mountain landfill leachate.

(c) **Consideration in Lieu of KRS 68.178.** The substantial and measurable consideration provided by Operator to the County, including, without limitation, the acceptance for disposal of all County Waste at no cost, shall be deemed full, adequate and sufficient consideration and is hereby accepted in lieu of all taxes, fees, charges or other assessments otherwise applicable to the Facility, including, without limitation, any license fees that may be imposed pursuant to KRS 68.178; provided, however, absent subsequent agreement with the County, Operator shall remain responsible for real estate, personal property, net profits, and occupational taxes generally imposed by the County. The County expressly acknowledges that such consideration confers significant additional benefits, including: (i) avoiding the capital costs associated with expansion, permitting, and construction of a County-owned landfill and the long-term costs of operating and maintaining such a facility; (ii) reducing or eliminating ongoing operational expenses of the County and its Department of Public Works and other municipal services related to waste disposal; (iii) providing disposal cost savings that are projected to materially exceed any revenues that could be generated under KRS 68.178 based on a fee applied to Facility revenues; (iv) eliminating the need to rely on waste disposal outlets outside of the County; (v) establishing a long-term corporate partnership expected to generate ancillary community benefits; (vi) facilitating outside private investment in the County that will generate additional and ancillary tax revenues; and (vii) supporting economic development, including anticipated increases in property values.

## ARTICLE V. COUNTY OBLIGATIONS

**Section 5.01 County Deliveries.** In delivering County Waste to the Facility, the County shall or shall cause their designated haulers to, take steps to assure that all County Waste is delivered to the Facility in trucks capable of mechanical unloading directly into the working face of the Facility or at such other location as Operator shall direct. All such County Waste shall be transported in covered or enclosed vehicles such that it shall not spill or blow at or onto the

Facility and the surrounding area. Every vehicle delivering County Waste shall be clearly marked to identify the Solid Waste as the County's, or the driver thereof shall have and shall surrender to Operator some authorization or identification document reasonably acceptable to Operator. The County shall take all reasonable steps to assure that only Solid Waste acceptable at the Facility is delivered to the Facility by them or on their behalf by designated haulers.

**Section 5.02 Permitting Cooperation.** County agrees to cooperate with Operator with respect to Operator's permitting and permit modification efforts related to the Facility or Facility operations. If the County does not cooperate with Operator with respect to these efforts, then Operator has the right to terminate this Agreement, subject to the notice and cure provisions set forth in Section 8.02. This remedy is in addition to any other remedies available at law or equity.

## ARTICLE VI. SERVICE AREA AND SOLID WASTE MANAGEMENT PLAN

**Section 6.01 Service Area**. Beginning on the Commencement Date, Operator may receive and accept for disposal at the Facility Solid Waste generated both within the boundaries of the County ("**In-County Waste**") and without or outside the boundaries of the County, including Solid Waste from outside of the Commonwealth of Kentucky ("**Out-of-County Waste**"). The County shall expressly permit such receipt and acceptance of In-County Waste and Out-of-County Waste, recognizing that Operator's ability to receive, accept and dispose of Out-of-County Waste is material inducement to enter into this Agreement. The County shall take no action restricting or inhibiting the Facility from receiving Out-of-County Waste.

**Section 6.02 Solid Waste Management Plan**. Beginning on the Notice Date and continuing throughout the Term of this Agreement, the County shall ensure that the Plan at all times has all Plan Amendment provisions in effect and in force. Further, the County agrees, during the Term, that it will not at any time revise or further amend the Plan to in any way limit, restrict, or impair the operations of the Facility, the methodology of transport of materials to the Facility site, or the types, origins, or nature of material that is received, accepted and disposed at the Facility. Nothing contained in the Plan, or any additions or modifications thereto, shall be inconsistent with this Agreement. The County further affirmatively agrees to pursue such amendments or revisions to the Plan as may be necessary, appropriate and reasonable to allow for expansion of the Facility.

**Section 6.03 Additional Consideration and Assurances**. Beginning on the Notice Date and so long as Operator, or its successor operator, is legally permitted and authorized by the Commonwealth of Kentucky and the Cabinet to develop, construct, or operate the Facility, the County shall not (i) amend its Plan; (ii) refuse any approval without breach by Operator; or (iii) take such other action, including, but not limited to, adopting or passing any new ordinances, resolutions, orders, or language regarding obstructing or interfering with the Facility's lawful activities and any future Facility expansion plan applications or permit amendments, or any attempt to modify current or adopt new zoning or land use designations that apply to the land comprising the Facility, that in any case, would force the operations of the Facility to cease, cause closure of the Facility, significantly adversely affect the operations of the Facility as contemplated in its permits, or substantially adversely affect the profitability or cost of operations; provided, however, the County reserves from the foregoing the ability to review the technical design and standards for construction and operation of the Facility, and to comment on

the Authorization applications in order to assure that the design meets appropriate standards set by federal and state law.

**Section 6.04 Damages**. The Parties acknowledge and agree that the Operator is committing substantial capital expenditures and undertaking a large-scale, long-term infrastructure investment in express reliance upon the County's obligations under this Agreement, and particularly Sections 6.01, 6.02, and 6.03, that such obligations are a fundamental and material inducement to Operator's decision to proceed, and that any failure by the County to fulfill or maintain such obligations would cause the Operator severe and irreparable economic harm. If the County violates any part ofSection 6.02 or Section 6.03 above, or if the County abrogates any right provided to the Operator in Section 6.02 or Section 6.03, the County shall compensate Operator with the "Specific Damages." The Specific Damages shall equal (a) the aggregate of Operator's documented capital expenditures and costs incurred in the development, permitting, construction, operation, and maintenance of the Facility, net of amounts previously recovered through operations; plus (b) a reasonable, good faith estimate of the net profits Operator would have earned during the remaining portion of the Term based on historical performance and/or commercially reasonable assumptions; plus (c) the costs of all contingent liabilities that would be accelerated by such violation or abrogation, including the costs of closure and post-closure obligations related to the Facility. In addition to the Specific Damages contained in this Section, Operator shall be entitled to cease all obligations under this Agreement for the benefit of County without any liability. The Specific Damages to be awarded to Operator under this Section are cumulative and in addition to any and all remedies available at law or in equity.

## ARTICLE VII. FACILITY OPERATIONS

**Section 7.01 Compliance with Laws and Recordkeeping.**

**(a) Compliance with Applicable Law.** Operator shall at all times operate the Facility in compliance with all Applicable Law.

**(b) Records.** A copy of all Records submitted by Operator to the Cabinet to comply with the requirements of 401 KAR Chapters 47 or 48 shall be forwarded to the Solid Waste Coordinator at the same time the Records are submitted to the Cabinet. A full and complete updated copy of the Permit, if any, shall be forwarded by Operator to the Solid Waste Coordinator within fifteen (15) days of receipt by Operator. Any future applications, amendments or attachments submitted or received by Operator shall likewise be forwarded to the Solid Waste Coordinator within fifteen (15) days of submission or receipt. Operator shall maintain documents as required under 401 KAR 48:090. Any notifications from the state or federal government to the Facility regarding notices of violations, deficiencies, and copies of inspection reports shall be forwarded by Operator to the Solid Waste Coordinator within three (3) business days of receipt by Operator.

**(c) Disclosure Statement.** Operator shall deliver to the Solid Waste Coordinator, at the same time delivery is made to the Cabinet, any new or amended key personnel forms which are required to be filed by KRS 224.40-330 as part of Operator's disclosure statement regarding the Facility.

**(d) Notification of Activities.** In the event Operator intends to undertake construction or activity at the Facility that is likely to temporarily generate extraordinary noise or odor, Operator shall notify the Solid Waste Coordinator (which notification may be verbal). When practicable, Operator's notice shall be at least five (5) business days prior to undertaking such construction or activity. Operator and the Solid Waste Coordinator shall, under circumstances when five (5) business days advance notice can be provided, discuss the scope and anticipated duration of the construction or activity, and mutually agree whether to provide additional notification to the public through a newspaper advertisement or some other means reasonably calculated to reach a majority of the affected population.

**Section 7.02 Prohibited Materials.**

**(a) Prohibition of Certain Materials.** The Facility shall not knowingly accept for disposal at the Facility any of the following (collectively, "**Prohibited Materials**"): (i) listed or characteristic Hazardous Waste; (ii) Nuclear Waste; (iii) Untreated Medical Waste; (iv) NORM that is prohibited by Kentucky law from disposal in a contained landfill or this Agreement; and (v) any other waste prohibited by Applicable Law or this Agreement from being disposed at the Facility. Title to Prohibited Materials received or deposited at the Facility shall never be deemed accepted by Operator and title to such Prohibited Materials shall never, regardless of circumstance, pass to Operator.

**(b) Rejection of Materials.** Operator has the right to reject any Solid Waste that it, in its sole, but reasonable discretion, believes may be hazardous, dangerous to the environment or human health, dangerous to the integrity of the Facility, or otherwise of an unacceptable nature. Operator shall reject any Solid Waste that, at the time of receipt, it knows is not permitted by Applicable Law, the Permit, or this Agreement to be accepted by Operator or disposed at the Facility.

**(c) Inspections and Locations of Wastes.** Operator shall perform reasonable daily random inspections of materials delivered to the Facility for disposal so that detection and rejection of Prohibited Materials under this section may be facilitated. Operator shall maintain reasonably sufficient documentation to identify the source of all materials received and disposed at the Facility and shall adopt procedures which will enable Operator to locate within the Facility, with reasonable specificity, any Prohibited Materials which were unknowingly received and disposed at the Facility. In the event that Operator is made aware from a credible source that any Prohibited Materials were received and disposed in the Facility, Operator shall promptly notify the Solid Waste Coordinator. Such notification may be verbal and shall not be required for the routine removal of tires, batteries, and similar items from the Facility.

**(d) Radioactive Materials.** If any Solid Waste delivered to the Facility activates radiological detection equipment or is reasonably suspected of containing radioactive or other unauthorized materials, Operator shall promptly isolate and manage such Solid Waste in accordance with Applicable Law and the directives of any governmental authority having jurisdiction. Operator shall use commercially reasonable efforts to manage and dispose of such Solid Waste in a safe and cost-effective manner. All

reasonable and documented costs and expenses incurred by Operator in connection with the handling, storage, testing, transportation, treatment, or disposal of such Solid Waste shall be submitted to the County for review and payment.

**Section 7.03 County Inspection Rights.** The County shall have the right to inspect the Facility at any time during the operational hours of the Facility to verify compliance with the terms of this Agreement and any Applicable Law. The County shall have the right to inspect the Facility during non-operating hours if it reasonably believes that an emergency condition is occurring at the Facility. Operator will within one (1) hour of a request arrange a representative of Operator to accompany the representative(s) of the County during any such inspection. The representatives of the County shall possess at least the minimum qualifications required by KRS 224.43-340. The County and its agents agree to abide by all safety-related rules and regulations pertaining to visitors at the Facility.

**Section 7.04 Inquiries and Complaints.** As of the Commencement Date and for the Term, Operator shall assign and designate a telephone number, email address, and representative which shall be responsible for receipt of inquiries and complaints which may arise from the public relative to the operation of the Facility as outlined in this Agreement. Operator shall keep a log of the date and time such inquiry or complaint was received, the nature of the inquiry or complaint, and the name of the person initiating such contact, and the date and time which response was made to such inquiry or complaint. Operator may respond to such inquiries or complaints in a reasonably prompt manner. If any complaint persists, before initiating any formal process or enforcement action, the County and Operator shall confer and discuss potential resolutions.

**Section 7.05 Litter Control.**

**(a) Covered Loads.** Operator shall advise Commercial Haulers transporting Solid Waste to the Facility to cover their loads and will use commercially reasonable efforts to ensure that vehicles are empty when leaving the Facility in order to avoid wind-blown litter.

**(b) Highway Cleanup.** Operator shall be responsible for the regular collection of litter which results from the operation of the Facility or transportation of Solid Waste to the Facility on the roads on the Facility property and on all County roads within one (1) mile of the Facility.

**Section 7.06 Traffic.**

**(a) County Transportation.** Operator shall cooperate with County and State law enforcement officials and with Commercial Haulers to enforce the speed limits on County roads. Operator shall also advise Commercial Haulers that they are required to register, as a state requirement, with the County to transport Solid Waste within the County and on County roads.

**(b) Scales and Weight Records.** For deliveries of Solid Waste via trucks, Operator shall operate and maintain motor truck scales of an accuracy consistent with state law to weigh all vehicles delivering Solid Waste to the Facility. Each incoming truck shall be weighed

and gross weight, tare weight, time, truck identification, type of Solid Waste, hauler name, and source shall be noted on a weight record.

**Section 7.07 Operational Rules.** Operator shall have the right to implement such additional measures, rules and procedures as Operator deems necessary or appropriate for the safe and efficient operation of the Facility.

**Section 7.08 Railcar Delivery.** The Parties agree and acknowledge that Operator's development, construction, and operation of the Facility is dependent on the delivery of Solid Waste to the Facility via railcars. Such railcars may be of varying types and sizes. Operator intends to receive and accept Solid Waste from railcars delivered to the Facility site, unload such railcars, and deliver and dispose such Solid Waste to the working face of the Facility.

**Section 7.09 Tipping Fees.** Operator shall have the right to establish, charge, collect, and retain any and all fees and charges Operator deems appropriate for use of the Facility in its sole discretion, including, but not limited to, any and all tipping fees charged for the disposal or deposit of Solid Waste at the Facility.

**Section 7.10 Closure.**

**(a) Continuing Obligations in Accordance with Law.** Operator shall be responsible for the closure of the Facility and all required post-closure care in accordance with the provisions of KRS Chapter 224 and the regulations promulgated pursuant thereto. Operator shall, during the operating life of the Facility and the closure and post-closure care period established by 401 KAR 48:090 or subsequent legislation and regulations, maintain the cap, continue to perform groundwater monitoring, and perform necessary corrective action for all areas of the Facility used for disposal of Solid Waste that have been closed all in accordance with state and federal requirements.

**(b) Recordkeeping of Closure.** During the closure and any post-closure care periods, Operator shall provide and maintain an accurate file at the Facility, which shall contain a copy of all documents, Authorization applications, modifications, renewals, enforcement actions, sampling reports, quarterly reports, and all other documents required to be maintained and transmitted to the Cabinet under KRS 224 and the regulations thereunder.

**(c) Termination of Post-Closure Period.** After closure of the Facility and release of the Facility and Operator by the Cabinet from post-closure care requirements, the County, at its sole expense, shall have the right to enter the Facility to perform maintenance on the cap, perform groundwater and surface water monitoring, and to perform corrective action necessary to protect human health or the environment. Any actions by or on behalf of the County pursuant to this section shall be subject to oversight and prior approval by the Facility or Operator, provided that such approval shall not be unreasonably withheld. The County shall (i) provide a certificate of insurance from the entity conducting the actions demonstrating adequate coverage for damage caused by such entity; and (ii) indemnify and hold harmless the Facility and Operator from any claims, damages, suits, or causes of action, including reasonable attorney and expert witness fees, resulting from the actions of the County at the Facility.

## ARTICLE VIII. DEFAULTS AND REMEDIES

**Section 8.01 Default by Operator.** The occurrence of any one or more of the following events shall constitute a material default and breach of this Agreement by the Operator:

(a) **Non-Acceptance.** The unexcused failure of Operator to accept acceptable County Waste from the County at zero tip fee during the Term and such failure is continuing and not cured within ten (10) business days of notice to Operator by the County;

(b) **Insurance.** The failure of Operator to properly maintain insurance required pursuant to the terms and conditions of this Agreement and such failure is continuing and not cured within sixty (60) business days of notice to Operator by the County;

(c) **Violation of Law.** The failure of Operator to address, correct, or remedy promptly and in the proper and required manner any actual violation by Operator of any law, statute, rule, regulation, permit, or ordinance relating to the development, operation, closure/post closure care of the Facility. For purposes of this Agreement, Operator shall be deemed to have acted promptly if it corrects or commences correction of the violation in question within the time allowed by law, or within the time otherwise allowed by a court, tribunal or a governmental agency of competent jurisdiction.

(d) **Other Obligations.** The failure of Operator to observe or perform any of the other covenants, terms, conditions, or provisions of this Agreement to be observed or performed by Operator and such failure is continuing and not cured within sixty (60) business days of notice to Operator by County; provided, however, if the nature of Operator's default is such that more than sixty (60) business days are reasonably required for its cure, and the County agrees in writing that is the case, and such acknowledgement in writing shall not be unreasonably withheld, then Operator shall not be deemed to be in default if Operator commences such sure within said sixty (60) business day period and thereafter diligently prosecutes such cure or completion.

(e) **Bankruptcy.** The making by Operator of any general assignment, or general arrangement for the benefit of creditors; the filing by or against Operator of a petition to have Operator adjudged a bankrupt or a petition for reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Operator, the same is dismissed within sixty (60) days of filing); the appointment of a trustee or receiver to take possession of substantially all of Operator's assets located at, or serving, the Facility or of Operator's interest in this Agreement (where possession is not restored to Operator within thirty (30) days); or the attachment, execution or other judicial seizure of substantially all of Operator's assets located at the Facility or Operator's interest in this Agreement (where such seizure is not discharged within thirty (30) days).

**Section 8.02 Default by County.** The occurrence of one or more of the following events shall constitute a material default and breach of this Agreement by the County:

(a) **Insurance.** The failure of County to properly maintain insurance required pursuant to the terms and conditions of this Agreement and such failure is continuing and not cured within sixty (60) business days of notice to the County by Operator;

**(b) Other Obligations.** The failure of County to observe or perform any of the other covenants, terms, conditions, or provisions of this Agreement to be observed or performed by County and such failure is continuing and not cured within sixty (60) business days of notice to County by Operator; provided, however, if the nature of County's default is such that more than sixty (60) business days are reasonably required for its cure, and Operator agrees in writing that is the case, and such acknowledgement in writing shall not be unreasonably withheld, then County shall not be deemed to be in default if County commences such sure within said sixty (60) business day period and thereafter diligently prosecutes such cure or completion.

**Section 8.03 Remedies.** In the event of any default or breach by a Party hereunder, the other Party may, in its sole discretion at any time thereafter, by written notice and without limiting the non-breaching Party in the exercise of any right or remedy which the non-breaching Party may have by reason of such default or breach, either pursuant to the terms of this Agreement, and/or otherwise by operation of law, elect to terminate this Agreement, in which event the non-breaching Party may recover from the breaching Party all damages it has or may incur through the date of such termination by reason and as a consequence of the breaching Party's default, including, but not limited, reasonable attorney's fees, court costs and litigation expenses.

**Section 8.04 Limitation of Liability.** With the exception of the damages calculated pursuant to Section 6.04, to the fullest extent permitted by law, neither Party shall be liable to the other for any special, consequential, incidental, exemplary, or punitive damages, including without limitation lost profits, loss of business opportunity, or loss of goodwill, arising out of or relating to this Agreement. For the avoidance of doubt, nothing in this Section shall limit or restrict either Party's ability to seek, recover, or enforce any claim for actual, direct damages, or any other damages or remedies that are expressly permitted under this Agreement.

## ARTICLE IX. FORCE MAJEURE AND CHANGE-IN-LAW

**Section 9.01 Force Majeure.** If Operator or the County is rendered unable, wholly or in part, by a Force Majeure Event to carry out any of its obligations under this Agreement, the obligations of Operator or the County, as the case may be, shall be suspended during the continuation of any inability so caused by the Force Majeure Event, but for no longer period. If Operator or the County intends to rely upon a Force Majeure Event to suspend obligations as provided in this section, such Party shall notify the other Party to this Agreement as soon as practicable, verbally and in writing, describing, in reasonable detail, the circumstances of the Force Majeure Event. The Party relying upon a Force Majeure Event shall have the duty and obligation to use reasonable business efforts to cure or eliminate such Force Majeure Event, and shall, during the period of such Force Majeure Event, periodically advise the other Party of the status of the Force Majeure Event and the projected duration of the same. Notice shall be given when the effect of the Force Majeure Event has ceased.

**Section 9.02 Change-in-Law.**

**(a) Adjustments.** This Agreement is entered based on the law, regulations, permit terms, conditions, facts and reasonable expectations as of the Effective Date. If a Change-in-Law occurs, then Operator shall be (a) entitled to adjust fees, charges, and other

compensation hereunder to offset such increased cost or (b) shall, at its sole discretion, cease acceptance of County Waste at no cost without any liability or obligation whatsoever to the County hereunder.

**(b) Railroad Changes.** This Agreement is entered based on the understanding provided herein that Operator's development and continued operation of the Facility is contingent on delivery to the Facility of Solid Waste by rail. If rail access to the Facility is not continuously available without interruption during the Term or if there is any change or condition concerning available rail lines, railcars, or rail operations, including, but not limited to, impacts on ingress or egress to the Facility site, rail closure or suspension, train failure, rail cancellation, strike, or materially excessive restriction or rate increase from carriers or providers, which substantially or significantly affects the cost to Operator of design, engineering, development or operation of the Facility or any operation or program required by this Agreement, then Operator shall be entitled to (i) adjust fees, charges and other compensation hereunder to offset such increased cost or (ii) at its sole discretion, cease acceptance of County Waste at no cost without any liability or obligation whatsoever to the County hereunder.

## ARTICLE X. INSURANCE AND INDEMNIFICATION

### Section 10.01 Insurance Coverages.

**(a) Operator's CGL Insurance.** Beginning on the Commencement Date, Operator shall maintain during the duration of the development, construction, operation, and any applicable post-closure care period of the Facility a Commercial General Liability policy with limits of liability no less than one million dollars ($1,000,000.00). The County shall be made an additional insured on the policy. The policy shall pay on behalf of the Facility or the County for any damages for bodily injury or property damage for which Operator or the County has or will become legally liable to pay as a result of an occurrence arising from the development, construction, or operation of the Facility. Operator shall pay any deductible applied under the terms of the policy. Operator shall provide to the County upon the Commencement Date, and annually thereafter, certificates of insurance evidencing that the policy is in effect. If possible and commercially reasonable, the County shall be notified by the insurance company of any cancellation, reduction in coverage, change in coverage, claim, or of any event of whatever kind or nature which might impair the ability of Operator to comply with the provisions of this Agreement. If the Permit or any other Authorization is transferred, Operator shall maintain the policy in effect until the successor or assign of the Facility has put a substitute policy into effect to comply with this Section.

**(b) County Insurance.** Beginning on the Commencement Date, the County shall, or shall cause their contracted Commercial Hauler delivering on their behalf to, maintain a Commercial General Liability policy with limits of no less than one million dollars ($1,000,000.00) and an Automobile Liability Policy with limits of liability no less than two million dollars ($2,000,000.00). Operator shall be made an additional insured on both policies. The Policies shall pay on behalf of the County for any damages for bodily injury or property damage for which the County or Operator has or will become legally

liable to pay as a result of an occurrence arising from the delivery of Solid Waste to the Facility.

**(c) Pollution Liability Insurance.** Beginning on the Commencement Date, Operator shall maintain during the operation of the Facility and any applicable post-closure care period an Environmental Remediation Legal Liability policy with limits of liability no less than five million dollars ($5,000,000.00). The County shall be made an additional insured on the policy. The policy shall pay on behalf of Operator or the County for any Losses (as defined below) for which Operator or the County has or will become legally liable to pay as a result of pollution conditions on, at, under or emanating from the Facility. Operator shall pay any deductible applied under the terms of the policy. Operator shall provide to the County prior to the Commencement Date, and annually thereafter, certificates of insurance evidencing that the policy is in effect. If possible and commercially reasonable, the County shall be notified by the insurance company of any cancellation, reduction in coverage, change in coverage, claim, or of any event of whatever kind or nature which might impair the ability of Operator to comply with the provisions of this Agreement. If the Permit or any other Authorization for the Facility is transferred, Operator shall maintain the policy in effect until the successor or assign of the Facility has put a substitute policy into effect to comply with this section.

**Section 10.02 Indemnification.**

**(a) Operator Indemnification of County.** Beginning on the Effective Date, Operator shall indemnify and hold the County harmless from any and all claims, damages, suits, or causes of action, including reasonable attorney's, consultant and expert witness fees (collectively, "**Losses**"), caused by (i) negligence, recklessness, or willful misconduct in the design, construction, operator or closure of the Facility; (ii) failure of Operator to comply with post-closure requirements; and (iii) the negligence or willful misconduct of Operator; provided, however, that Operator shall not be obligated to indemnify the County (A) to the extent that any such Loss is caused by the negligence or willful misconduct of the County or (B) with respect to the handling, collection, containment, separation, remediation, storage, transportation, processing and/or disposal of Prohibited Materials unless and to the extent, that such Losses arise from the gross negligence or willful misconduct of Operator.

**(b) County Indemnification of Operator.** Beginning on the Effective Date, the County shall indemnify and hold Operator harmless from any and all Losses caused by any breach of this Agreement or the negligence or willful misconduct of the County; provided, however, that the County shall not be obligated to indemnify Operator to the extent that any such Loss is caused by the negligence or willful misconduct of Operator (gross negligence in the case of handling, collection, containment, separation, remediation, storage, transportation, processing and/or disposal of Prohibited Materials delivered by or on behalf of the County).

**(c) Claims.** Promptly after a Party discovers an injury, damages, or other event of non-compliance covered by the indemnification provision set forth in Section 10.02(c) above, or after receipt by a Party hereto of notice of any claim, action, suit, or proceeding by any

Person who is not a party to this Agreement (collectively, an "**Action**") which is subject to indemnification hereunder, such Party (the "**Indemnified Party**") shall give reasonable notice to the other Party (the "**Indemnifying Party**"). At the sole expense and liability of the Indemnifying Party and within a reasonable time after the giving of such notice by the Indemnified Party, the Indemnifying Party shall: (i) notify the Indemnified Party in writing of the Indemnifying Party's intention to assume the defense of such Action; and (ii) retain at its sole expense legal counsel reasonably satisfactory to the Indemnified Party to conduct the defense of such Action. The Indemnified Party shall cooperate with the Indemnifying Party in the defense, compromise, or settlement of any such Action as the Indemnifying Party may reasonably request. If the Indemnifying Party so assumes the defense of any such Action, the Indemnified Party shall have the right to employ separate counsel and to participate in (but not control) the defense, compromise, or settlement thereof, but the fees and expenses of such counsel shall be the expense of the Indemnified Party. The Indemnified Party shall not settle or compromise any such Action for which it is entitled to indemnification hereunder without the prior written consent of the Indemnifying Party, unless the Indemnifying Party shall have failed, after reasonable notice thereof, to undertake control of, manage, resolve, and address such action in the manner provided for in this Agreement. The Indemnifying Party shall not settle or compromise any such Action in which any relief other then the payment of money damages is sought against the Indemnified Party unless the Indemnified Party consents in writing to such compromise or settlement.

## ARTICLE XI. MISCELLANEOUS

**Section 11.01 Non-Exclusivity.** This Agreement is non-exclusive, and nothing contained herein shall limit, restrict, or prohibit the County or the Fiscal Court from entering into host agreements with other parties concerning the development of other Solid Waste disposal facilities and the management of County Waste; provided, however, that the terms contained herein are binding and shall not be abridged by further agreement between the County and a third party.

**Section 11.02 Discretion.** The County may review the technical design and standards for construction and operation of the Facility, and comment on the permit applications in order to ensure that the design meets appropriate standards set by Applicable Law.

**Section 11.03 Dispute Resolution.** All claims or dispute arising between the Parties to this Agreement which relate to this Agreement or a breach thereof shall be resolved as follows:

**(a) Notice.** Notice of the claim, dispute or alleged breach shall be delivered to the other Party in accordance with Section 11.04 of this Agreement.

**(b) Mediation.** After notice has been provided to the non-moving Party, the Parties shall first attempt in good faith to resolve such claim or dispute through non-binding mediation. Within ten (10) days of written notice by either Party requesting mediation, the Parties shall conder and jointly select a mutually acceptable mediator. If the Parties cannot agree on a mediator within such period, each Party shall, within the next five (5) business days, propose one mediator, and those two mediators shall jointly select a third individual who shall serve as the mediator. Mediation shall occur within thirty (30) days

of the mediators' selection unless otherwise agreed. The Parties shall share the mediators' fees and costs equally, and each shall bear its own attorney's fees and related expenses for mediation.

(c) **Arbitration.** If the claim or dispute is not resolved through mediation within forty-five (45) days after the mediators' selection, the claim or dispute shall be submitted to binding arbitration administered by AAA or JAMS pursuant to its commercial arbitration rules, except as modified herein. The arbitration shall be conducted before a panel of three (3) neutral arbitrators. Each Party shall appoint one arbitrator within fifteen (15) days of the demand for arbitration. The two Party-appointed arbitrators shall jointly select the third arbitrator, who shall serve as chair of the panel. If either Party fails to appoint its arbitrator within the allotted time, or if the Party-appointed arbitrators cannot agree on the chair within ten (10) days, the administering organization AAA/JAMS shall appoint the remaining arbitrator(s). The place of arbitration shall be Ashland or London, Kentucky, and the arbitration hearing shall commence no later than ninety (90) days after the full panel is constituted, unless the panel determines that additional time is warranted. The panel's written award shall be final and binding, and judgment may be entered on the award in any federal court of competent jurisdiction; provided, however, that the arbitration panel shall have no authority in any event to award punitive or special damages, and any purported award of punitive or special damages shall be subject to *de novo* review in any federal court of competent jurisdiction.

(d) **Federal Court Proceedings.** Following the issuance of the arbitration award, either Party may seek relief exclusively in the United States District Court for the Eastern District of Kentucky (Ashland or London Division) for the limited purposes of confirming, enforcing, modifying, or vacating the award to the extent permitted by law. No Party may file any lawsuit or seek judicial relief by the federal court prior to the completion of mediation and arbitration as required above, except for interim injunctive relief to preserve the status quo.

(e) **Governing Law.** Any dispute arising under this Agreement shall be governed by the laws of the Commonwealth of Kentucky, without reference to its conflict of laws provisions, and shall be filed in the United States District Court for the Eastern District of Kentucky (Ashland or London Division).

(f) **Waiver of Jury Trial.** To the fullest extent permitted by Applicable Law, the Parties hereby knowingly, voluntarily, and irrevocably waive any right to a trial by jury in any action, suit, proceeding, or claim arising out of or relating to this Agreement. This waiver applies to all claims whether sounding in contract, tort, statute, or otherwise.

**Section 11.04 Notices.** Any notices or communication required or permitted hereunder, unless otherwise specified herein, shall be in writing and sent by certified or registered mail to the addresses set forth below. If any contact has changed, the Party whose contact has changed shall immediately notify the other Party of such change in writing in accordance with this Section.

**If to the County:**

Pike County
Judge Executive Office
146 MAIN ST.
Pikeville, KY 41501

**With a copy to:**

______________
______________
______________
______________

**If to Operator:**

~~[NewCo]~~ AMERICAN LAND RESERVE LLC
555 Taylor Road
Enfield, CT 06082
Attn: Frank M. Antonacci, COO

**With a copy to:**

~~[NewCo]~~ AMERICAN LAND RESERVE LLC
555 Taylor Road
Enfield, CT 06082
Attn: Christopher Antonacci, Esq., General Counsel

**Section 11.05 Submittal of New Proposal.** During the Initial Term of this Agreement, but not before the nineteenth (19th) anniversary of the Commencement Date, the County may publish a request for proposals in compliance with constitutional requirements and statutory requirements for provision of capacity for the disposal of County Waste for the twenty (20) year period following the expiration of the Initial Term of this Agreement. If the County publishes such a notice, the Facility may submit a proposal in response to the request for proposals that contains provisions that are equivalent or better than the provisions in this Agreement. The County shall consider the proposal in accordance with the applicable procedures then in effect; provided that the Facility will only be required to submit a proposal for a term of up to twenty (20) years or a term of years equal to the estimated remaining life of the Facility, based on the average annual rates of disposal at the time the proposal is submitted.

**Section 11.06 Waiver.** Waiver of non-compliance at any time, by any Party, of the terms or conditions of this Agreement shall not be deemed a waiver or future non-compliance with such terms or conditions or waiver of any other provisions contained in this Agreement.

**Section 11.07 Binding.** All agreements set out herein shall be binding upon and shall inure to the benefit of each of the Parties hereto and their successors and permitted assigns and to their respective counterparts should any corporation or limited liability company be bought, sold, leased or the status changed in any manner including by purchase contract.

 BA

**Section 11.08 Severability.** If any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect, the remaining provisions shall remain in full force and effect. The Parties further agree that any such invalid, illegal, or unenforceable provision shall be modified, narrowed, or "blue-penciled" by a court or arbitrator pursuant to this Agreement to the minimum extent necessary to make it valid and enforceable while preserving, as closely as possible, the Parties' original intent.

**Section 11.09 Entire Agreement.** This Agreement embodies and constitutes the entire understanding between the Parties with respect to the transaction contemplated herein. All prior or contemporaneous agreements, understanding, representations, and statements, oral or written, are merged into this Agreement. Neither this Agreement nor any provision hereof may be waived, modified, amended, discharged, or terminated except by an instrument in writing signed by both Parties and then only to the extent set forth in such instrument.

**Section 11.10 Headings and Recitals.** Neither the headings nor the recitals to this Agreement shall be interpreted to create any right or obligation on the part of any Party and shall not affect the construction or interpretation of the Agreement.

**Section 11.11 Enforceability.** This Agreement has been duly authorized, dated, and delivered by all Parties and constitutes a legal, valid, binding obligation of all the Parties and is enforceable in accordance with its terms.

**Section 11.12 No Third-Party Beneficiaries.** Except as provided in this Agreement, this Agreement does not confer any rights or remedies to any Person other than the Parties and their respective successors and assigns, nor shall any provision give any third parties any right or rights of action against any Party to this Agreement.

**Section 11.13 No Interest Acquired.** This is an Agreement for the performance of the specific services described herein. Under no circumstances or conditions shall the operation of the Facility by Operator in accordance with this Agreement be deemed a public function, nor has the County acquired any interest, ownership or otherwise in the real or personal property or improvements or fixtures at the Facility by virtue of this Agreement.

**Section 11.14 Waiver of Governmental Immunity.** The County acknowledges and agrees that, in entering into this Agreement, it is engaging in a proprietary and commercial function, not a governmental function. The County expressly waives, to the fullest extent permitted by Kentucky law, any and all governmental immunity, sovereign immunity, or other immunity from suit or liability that would otherwise bar or limit the enforcement of this Agreement, including actions for breach, declaratory relief, or specific performance. The County agrees that it may be named as a party in any action brought to enforce the terms of this Agreement. The County further represents that it has full authority under Applicable Law to enter into this Agreement and to waive such immunity, and that this waiver constitutes a valid and binding obligation of the County.

**Section 11.15 Drafting.** All Parties have been given the right to be represented by counsel during the negotiation and drafting of this Agreement, and this Agreement has been drafted through the combined efforts of all Parties. No provision in this Agreement shall be construed in

favor of or against either Party as a result of that Party's participation in the drafting of such provision.

**Section 11.16 Transfer or Assignment of Agreement.** Operator may not transfer or assign (whether by operation of law, merger, or otherwise) this Agreement, or its rights or obligations under this Agreement, without the prior written consent of the County, such consent not to be unreasonably withheld, conditioned, or delayed. Operator shall provide the County at least thirty (30) days' advanced notice of a transfer or assignment.

[*SIGNATURE PAGE FOLLOWS*]

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the dates set forth below.

| | |
|---|---|
| **PIKE COUNTY, KENTUCKY FISCAL COURT** | AMERICAN LAND RESERVE LLC ~~[NEWCO]~~, **a, Kentucky limited liability company** |
| By: Ray S Jones II | By: [signature] |
| Name: Ray S. Jones II | Name: Guy G. Antonacci |
| Title: Judge - Executive | Title: Manager |
| Date: 1/29/26 | Date: 2/10/26 |